# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE LUIS LUNA,<br><br>    Petitioner,<br><br>    v.<br><br>P. VASQUEZ, Warden,<br><br>    Respondent.<br>_____/ | CV F   05-1228 LJO DLB HC<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>[Doc. 1] |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

PROCEDURAL HISTORY[1]

Following a jury trial in the Kern County Superior Court, Petitioner was convicted of two counts of furnishing a controlled substance to a minor with the intent to cause the minor to be under the influence of a narcotic (Cal. Health & Saf. Code § 11380, subd (a), Counts 1 and 2); possession for sale of methamphetamine (Cal. Health & Saf. Code § 11378, Count 3); knowingly making available a place for the purpose of manufacturing or storing, for sale or distribution, methamphetamine (Cal. Health & Saf. Code § 11366.5, subd. (a), Count 4); possession of a firearm while under the influence of methamphetamine (Cal. Health & Saf. Code § 11550, subd. (e), Count 5); possession of a firearm by a convicted felon (Cal. Pen. Code § 12021, subd. (a),

---

[1] This information is derived from the petition for writ of habeas corpus and Respondent's answer to the petition.

1

Count 6); and possession of narcotics paraphernalia (Cal. Health & Saf. Code § 11364, Count 7). The jury further found that with regard to Counts One and Two, Petitioner was armed with a firearm within the meaning of California Penal Code section 12022, subdivision (a)(1), and in regard to Counts 3, 4, 5 and 6, that Petitioner was personally armed with a firearm in the commission of those offenses (Cal. Pen. Code § 12022, subd. (c)). (CT [F039979] at 249-250, 342-353.)

At a separate court trial, Petitioner was found to have previously been convicted of five (5) narcotics-related offenses (Cal. Health & Saf. Code § 11370.2, subd. (c)) and to have served six separate terms in state prison for felony convictions (Cal. Pen. Code § 667.5, subd. (b)). (CT [F039979] at 354-357.) Petitioner is serving an aggregate term of imprisonment of 23 years, computed as follows: the upper term of three years on Count 3, plus four years, consecutive, for the firearm enhancement thereon plus nine years (three years for each), consecutive, for the prior narcotics-related convictions and three years (one year for each), consecutive, for the prior prison term enhancements; 2 years (one-third of the middle term pursuant to California Penal Code section 1170.1, subdivision (a)), consecutive, on Count 1; and 2 years (one-third of the middle term pursuant to California Penal Code section 1170.1, subdivision (a)), consecutive, on Count 2. The trial court also ordered Petitioner to serve the upper term of three years on Count 5, but ordered this term to be served concurrently with the terms imposed on Counts 1, 2, and 3. The trial court further ordered that Petitioner serve the upper term of three years on Count 6, another three years for one of the prior narcotics-related convictions, and two years (one year for each) for the arming enhancements, however, all of these terms were stayed pursuant to the provisions of California Penal Code section 654. Petitioner was also ordered to serve six months in the county jail on Count 7, however, this term was ordered to be served concurrently with the sentence imposed in regard to Count 3. (CT [F044310] at 16-21.)

Petitioner filed a timely notice of appeal. Petitioner was initially sentenced to state prison on January 29, 2002. (CT [F039979] at 385-388, 402-404.) On June 19, 2003, the Fifth District Court of Appeal, reversed the judgment and remanded the case back to the trial court "to conduct an inquiry into [Petitioner]'s allegations concerning his counsel's inadequate performance . . . ."

(SCT [F044310] at 100.) Thereafter, on September 29, 2003, the trial court conducted a hearing on Petitioner's motion for substitute counsel. At the conclusion of the hearing, Petitioner's motion for substitute counsel was denied. (CT [F044310] at 13-14.) The trial court then entered an order acquitting Petitioner on Count 4 and directed the probation department to prepare a supplemental report. (CT [F044310] at 14.) On October 21, 2003, Petitioner was sentenced to the aggregate term of 23 years in state prison as described above. (CT [F044310] at 16-21.)

Petitioner subsequently filed a timely notice of appeal. On April 11, 2005, the California Court of Appeal, Fifth Appellate District affirmed the judgment and sentence.

On June 15, 2005, the California Supreme Court denied the petition for review. The petition was "denied without prejudice to any relief to which [Petitioner] might be entitled after this court determines in *People v. Black*, S126182, and *People v. Towne*, S125677, the effect of *Blakely v. Washington* (2004) [542] U.S. [296], 124 S.Ct. 2531, on California law." (Attachment, to Petition.)

Petitioner filed the instant petition for writ of habeas corpus on September 28, 2005. Respondent filed an answer to the petition on January 23, 2006, and Petitioner filed a traverse on March 31, 2006. (Court Docs. 8, 14.)

## STATEMENT OF FACTS[2]

On the evening of August 24, 2001, 16-year-old Rosalia M. and 14-year-old Ofelia M. went to [Petitioner's] home in Bakersfield. [Petitioner] showed Ofelia a gun while the three were talking in [Petitioner's] bedroom. [Petitioner] then took some methamphetamine out of his pocket, melted it, and placed it in his methamphetamine smoking pipe. The girls asked if they could have some; [Petitioner] agreed and they took three or four "hits," or smokes, from the pipe. Ofelia also took three or four puffs of marijuana.

Bakersfield police soon thereafter found [Petitioner], Rosalia, and Ofelia in the bedroom while executing a warrant in search of narcotics. Rosalia and Ofelia both manifested physical signs of stimulant use, and lab tests conducted early the next morning indicated "strong" levels of methamphetamine in their systems. Officer John Blunt found methamphetamine inside the home and in [Petitioner's] pocket. As an experienced narcotics investigator, Officer Blunt opined the narcotics were possessed for the purpose of sale based on the large

---

[2] The Court finds the Court of Appeal correctly summarized, and judicially noticed from its prior opinion, the facts in its April 11, 2005, opinion, attached as Exhibit A, to Answer. Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.

quantity and packaging. Officers also uncovered $1,342 in cash, a small mirror, marijuana, two glass smoking pipes, an electronic gram scale, a loaded handgun, ammunition, a pager, and receipts acknowledging [Petitioner] paid rent for the Bakersfield residence. [citation omitted.]

(Exhibit A, at p. 2.)

## DISCUSSION

A.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.  Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus

will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

Here, because the California Supreme Court's opinion is summary in nature, however, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable

application of federal law under § 2254(d)(1)).

C.     Sixth Amendment Right to Jury Trial/Sentencing Enhancement

Petitioner contends that the trial court's imposition of an upper base term sentence on Count 3 (possession for sale of methamphetamine [Cal. Health & Saf. Code § 11378] violated his federal constitutional right to a trial by jury.

The legal landscape of California's sentencing law has drastically changed since Petitioner's conviction became final in 2005, and he filed the instant federal petition on September 28, 2005.[3]

In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), the Supreme Court overturned a sentencing scheme that allowed a state judge to enhance a defendant's penalty beyond the prescribed statutory maximum upon finding, by a preponderance of the evidence, that the defendant "acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation, or ethnicity." Apprendi v. New Jersey, 530 U.S. at 469. The Supreme Court reversed, holding that "any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to jury, and proved beyond a reasonable doubt." Id. at 490. (Emphasis added.)

In Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004), the Court explained that the "statutory maximum" for *Apprendi* purposes is the "maximum" sentence a judge may impose solely on the basis of facts reflected in the jury verdict or admitted by the defendant. In other words, the relevant "statutory maximum " is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional facts." Id. at 303-304.

In both Apprendi and Blakely, state law established an ordinary sentencing range for the crime the defendant was convicted of committing, but allowed the court to impose a sentence in

---

[3] In this case, the petition for review was denied by the California Supreme Court on June 15, 2005. Thus, direct review would conclude on September 13, 2005, when the ninety (90) day period for seeking review in the United States Supreme Court expired. Barefoot v. Estelle, 463 U.S. 880, 887 (1983); Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir.1999) (concluding period of "direct review" includes the period within which one can file a petition for a writ of certiorari in the United States Supreme Court); Smith v. Bowersox, 159 F.3d 345, 347 (8th Cir.1998).

excess of that range if it determined the existence of specified facts not intrinsic to the crime. In each case the Supreme Court held that a sentence in excess of the ordinary range was unconstitutional because it was based on facts that were not admitted by defendant or found true by the jury beyond a reasonable doubt.

In United States v. Booker, 543 U.S. 220, 125 S. Ct. 788 (2005), the Court applied its holding in Blakely to the Federal Sentencing Guidelines, finding the Guidelines unconstitutional. In reforming the Guidelines, the Court stated "If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range." Id. at 233. "For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." Id.

In People v. Black, 35 Cal. 4th 1238 (June 20, 2005), the California Supreme Court held that California's Determinative Sentencing Law satisfied federal constitutional law as follows: "*Blakely* and *Booker* established a constitutionally significant distinction between a sentencing scheme that permits judges to engage in the type of judicial fact finding typically and traditionally involved in the exercise of judicial discretion employed in selecting a sentence from within the range prescribed for an offense, and a sentencing scheme that assigns to judges the type of fact-finding role traditionally exercised by juries in determining the existence or nonexistence of elements of an offense." People v. Black, 35 Cal.4th at 1253. "[I]n operation and effect, the provisions of the California determinate sentence law simply authorize a sentencing court to engage in the type of fact-finding that traditionally has been incident to the judge's selection of an appropriate sentence within a statutorily prescribed sentencing range." Id. at 1254. The Court held that the "presumptive" midterm does nothing more than establish a "reasonableness" constraint on an otherwise wholly discretionary sentencing choice akin to that which the United States Supreme Court has deemed constitutional. Id. at 1261.

Most recently, in Cunningham v. California, __ U.S. __, 127 S.Ct. 856 (2007), the

Supreme Court overruled the holding in Black, and held that the middle term in California's determinate sentencing law was the relevant statutory maximum for the purpose of applying Blakely and Apprendi. Id. at 868. Specifically, the Court held that imposing the upper sentence violated the defendant's Sixth and Fourteenth Amendment right to a jury trial because it "assigns to the trial judge, not the jury, authority to find facts that expose a defendant to an elevated 'upper term' sentence." Id. at 860.

In Count Three of the amended information, Petitioner was charged as follows:

> On or about August 24, 2001, Jose Luis Luna, did willfully and unlawfully possess for purpose of sale a controlled substance, to wit: methamphetamine, in violation of Health and Safety Code section 11378, a felony.
> It is further alleged as to Jose Luis Luna, was personally armed with a firearm during the commission of the above offense, within the meaning of Penal Code section 12022(c).

(CT 207-208.) Several prior convictions were also alleged in the amended petition. (*See* CT 208-213.) It was noted in the probation report, and adopted by the trial court at sentencing, that Petitioner could only be punished for three prior prison terms pursuant to California Penal Code section 667.5(b). (Exhibit B, at p.2, attached to Answer.)

The jury returned a finding of guilt as to both allegations, i.e. possession of methamphetamine for the purpose of sale and being personally armed with a firearm during the commission of this offense. (CT 347.)

At the sentencing hearing after remand, the state trial court articulated its reasons for imposing the upper base term on Count 3 as follows:

> I'm going to accept the recommendation of probation as made. I don't see any reason to alter the Court's previous determinations as to those other items. I think this sentencing recommendation is appropriate, and so I'm just going to be adopting it just as it is made.[4]

(RT [F044310] at 33.)

The trial court apparently adopted (albeit without expressly saying so) its original reasons for imposing an upper term sentence on Count 3. At the initial sentencing hearing on January 29, 2002, the trial court explicated its reasons for sentencing Petitioner to serve the upper term on

---

[4] In his supplemental report, the probation officer recommended that Petitioner be sentenced to serve the upper term of imprisonment on Count 3. (Exhibit B, attached to Answer.)

Count 3 as follows:

> With regard to the sentencing factors, the Court will find that there are no circumstances in mitigation. There are circumstances in aggravation, those being that [Petitioner's] prior convictions as an adult are numerous; Number 2, [Petitioner] was on parole when the crimes were committed; and, third, [Petitioner]'s prior performance on parole was unsatisfactory, due to his reoffending in this case.

(CT [F044310] at 83.)

At the time Petitioner's petition for review was denied, without prejudice, on June 15, 2005, the California Supreme Court had not rendered its decision in People v. Black. (Attachment to Petition.) In denying Petitioner's claim on direct appeal, the California Court of Appeal held:

> Under California's determinate sentencing law, the court must exercise its discretion to select a term within the particular range (lower, middle, or upper) allowed for a specific offense. The court's discretion is informed by its evaluation of factors in mitigation and aggravation. These sentencing factors, consistent with the definition found in *Apprendi*, are weighed by the sentencing judge in determining the term of imprisonment within the specific offense's sentencing range. If there are no such factors or neither the aggravating nor mitigating factors preponderate, the court shall choose the middle term; additionally, the court retains the discretion to impose either the upper or middle term where it finds the upper term is justifiable. (*People v. Thornton* (1985) 167 Cal.App.3d 72, 77.) Such an exercise of discretion does not violate the constitutional principles set forth in *Apprendi* and followed in *Blakely* because the court's discretion is exercised within the specific statutory range of sentence. (See *United States v. Booker*, supra, 543 U.S. at p.___ [125 S.Ct. At p. 750] (maj. opn. of Stevens, J.); [125 S.Ct. at p. 775] (dis. opn. of Stevens, J.).)
> Here, the trial court selected the upper term based upon its agreement with the recommendations of probation, which found no factors in mitigation and numerous factors in aggravation, principally defendant's prior convictions. This choice of term was within the statutory range allowed for the specific crime of which [Petitioner] had been convicted. No constitutional violation occurred.
> Even if *Blakely* were to apply to California's Determinate Sentencing Act, we conclude that the trial court's imposition of the upper term does not require reversal. As *Apprendi* states, and *Blakely* agrees, prior criminal convictions may be used by a sentencing judge, even absent a jury finding, to increase a defendant's term. (*Apprendi v. New Jersey*, supra, 530 U.S. at p. 488.)

(Exhibit A, at p. 6-7, attached to Answer.)

Because the state court's decision was issued prior to Cunningham, the issue becomes whether that decision should be applied retroactively to Petitioner on collateral review, which has

9

not yet been addressed by the Ninth Circuit Court of Appeals.[5] For the reasons discussed *infra*, this Court, like several other district courts, finds in the negative.

In Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060 (1986), the Supreme Court held that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague, 489 U.S. at 310. A new rule is one which "breaks new ground or imposes a new obligation on the States or the Federal Government;" in other words, a new rule is one where "the result was not dictated by precedent existing at the time of the defendant's conviction became final." Teague, 489 U.S. at 301; Snook v. Wood, 89 F.3d 605, 612 (9th Cir. 1996).

A Teague analysis requires the Court to engage in a three step process. First, the Court must determine the date the petitioner's conviction became final. See Caspari v. Bohlen, 510 U.S. 383, 390, 114 S.Ct. 948, 953-954 (1994); Snook, 89 F.3d at 612. Second, the Court must survey the legal landscape as it existed when the petitioner's conviction became final and determine whether a state court considering the petitioner's claim at that time would have felt compelled by existing precedent to conclude the new rule was required by the Constitution. Caspari, 510 U.S. at 390; Saffle v. Parks, 494 U.S. 484, 488 110 S.Ct. 1257, 1260 (1990). Third, if the Court determines that the petitioner seeks the benefit of new rule, the Court must consider whether the relief sought falls within one of the two narrow exceptions to non-retroactivity. See Gilmore v. Taylor, 508 U.S. 333, 345, 113 S.Ct. 2112, 2119 (1993). The two narrow exceptions are (1) "the rule places a class of private conduct beyond the power of the State to proscribe . . . or addresses a substantive categorical guarante[d] accorded by the Constitution;" or (2) the rule announces a "watershed rule[ ] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." Graham, 506 U.S. at 477-78, 113 S.Ct. 892, 903 (internal quotations omitted). The first exception only applies to rules that place certain private "individual conduct beyond the power of the criminal law-making authority to proscribe."

---

[5] Although the parties have not addressed whether the Cunningham decision may be applied retroactive to the instant case, the Court has discretion to raise the Teague retroactivity question sua sponte. See Caspari v. Bohlen, 510 U.S. 383, 389 (1994); Webster v. Woodford, 369 F.3d 1062 (9th Cir. 2004).

1  Teague, 489 U.S., at 307.  The second exception applies to watershed rules, which are those rules
2  that are "central to an accurate determination of innocence or guilt." Teague, 489 U.S. at 313,
3  109 S.Ct. 1060.  Watershed rules of criminal procedure implicate "the fundamental fairness and
4  accuracy of the criminal proceeding," Saffle, 494 U.S. at 495; Teague, 489 U.S. at 311, and are
5  the small core of rules that require procedures which are implicit in the concept of ordered
6  liberty.  Graham, 506 U.S. at 478, 113 S.Ct. at 903.
7        First, neither Apprendi, Blakely, or Booker, have been applied retroactively.  Sanchez-
8  Cervantes, 282 F.3d 664, 666-667 (9th Cir. 2002); Schardt v. Payne, 414 F.3d 1025 (9th Cir.
9  2005); United States v. Cruz, 423 F.3d 1119, 1121 (9th Cir. 2005).  This being so, it appears
10  highly unlikely that Cunningham would be applied retroactively.  This finding is supported by
11  several district courts that have addressed the issue.  See e.g. Fennen v. Nakayema, 494
12  F.Supp.2d 1148, 2007 WL 1742339 (E.D. Cal., June 14, 2007); Rosales v. Horel, 2007 WL
13  1852186 (S.D. Cal., June 26, 2007); Salerno v. Schriro, 2007 WL 2153584 (D. Ariz., July 24,
14  2007).
15        As was the case in Blakely, Cunningham shifted the decision-making authority from the
16  judge to the jury to determine any facts which may increase a defendant's sentence, such
17  determination is a procedural rather than substantive rule.  Further, a mere change in the law as to
18  the decision-making authority regarding factual findings bearing on a sentence enhancement is
19  not a watershed rule in criminal procedure.  See Schardt, 414 F.3d at 1036.
20        Here, the California Court of Appeal's decision, was subsequently affirmed by the
21  California Supreme Court's decision in Black, which was overruled by the United States
22  Supreme Court in Cunningham.  Although Petitioner may argue that Blakely was decided before
23  his conviction became final, and Cunningham is merely an extension of the holding in Blakely
24  and should be applied to the cases that were not final prior to the decision in Blakely, such
25  argument is not persuasive.  To make that determination, this Court would have to find that the
26  holding in Cunningham was dictated by Blakely.  The Cunningham decision was a six-member
27  majority opinion.  Justices Alito, Kennedy, and Breyer, filed a dissenting opinion, reasoning that
28  Apprendi should not be extended to California's determinate sentencing law, because the

sentencing scheme was indistinguishable from the *advisory* Guideline scheme approved of in Booker.[6]  Justice Alito, writing for the dissent stated that "the Booker Court unanimously agreed that judicial factfinding under a purely advisory guidelines system would [] comport with the Sixth Amendment." Cunningham, 127 S.Ct. at 874.  It was noted that "the California law gives a judge at least as much sentencing discretion as does the post-Booker federal scheme." Id. at 877.  "The California scheme-like the federal 'advisory Guidelines'-does require that this discretion be exercised reasonably." Id. at 878.

In light of the split and strong dissent in the Cunningham decision, it simply cannot be said that the result in Cunningham was dictated by Blakely.  Even though the holding in Blakely was the central reasoning in support of the majority opinion in Cunningham, mere application of a prior decision is not equivalent to being "dictated by precedent."  A new rule is defined as "a rule that ... was not 'dictated by precedent existing at the time the defendant's conviction became final.'" Whorton v. Bockting, __ U.S. __, 127 S.Ct. 1173, 1181 (2007).  In light of the fact that three justices found that California's sentencing scheme was more akin to the advisory Guidelines of which Booker approved, this Court finds that "reasonable jurists" could find the same.  See e.g. Whorton v. Bockting, 127 S.Ct. at 1181.  Accordingly, the state court's decision was not contrary to clearly established federal law because it applied the correct controlling authority.

However, even assuming it was error for the trial court to impose the upper term, any such error was harmless.  See Summerline v. Stewart, 341 F.3d 1082, 1120 (9th Cir. 2003) ("Apprendi errors are not structural and therefore are subject to harmless-error analysis"), rev'd on other grounds, Schriro v. Summerlin, 542 U.S. 348 (2004); see also United States v. Cotton, 535 U.S. 625, 634 (2002) (applying plain error analysis to Apprendi claim where the defendant did not object on that ground at trial); Neder v. United States, 527 U.S. 1, 19 (1999) (a trial court's failure to instruct a jury on all of the statutory elements of an offense is subject to

---

[6] Justices Kennedy and Breyer also believed that Apprendi could be applied to only sentencing enhancements based on the nature of offense (jury determination) and not the nature of the offender (judicial determination).  127 S.Ct. at 872-873.

harmless-error analysis). In sum, the prosecution must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error. See Chapman v. California, 386 U.S. 18, 24 (1967).

Here, the trial court imposed the upper term on Count Three based on the recommendation of probation, finding no circumstances in mitigation and finding the aggravating circumstance of Petitioner's prior criminal history. The undisputed evidence demonstrates that Petitioner suffered numerous prior convictions, and served several prison terms as a result of those convictions.[7] (*See* RT 326-338; CT [F039979] 354-358.) As stated by the state appellate court, the imposition of the upper term was based on Petitioner's prior convictions, which are exempt from the holdings in Apprendi and Blakely. Accordingly, based on this record, any error was harmless beyond a reasonable doubt, and Petitioner's claim is without merit.[8]

D.   Trial Court's Denial of Motion for Substitution of Counsel

Petitioner contends that the trial court improperly denied his motion for substitute counsel, resulting in a denial of his Sixth Amendment right to counsel and his Fourteenth Amendment right to due process of law.

  1.   Summary of Evidence At Hearing On Motion For Substitute Counsel After Remand

The trial court went very carefully through the list of complaints that were outlined on Petitioner's motion for substitute counsel and allowed Petitioner to elaborate on his claims. (See RT [F044310][9] 8.) The first complaint dealt with Mr. Evers' (defense counsel) failure to confer

---

[7] In Cunningham, unlike Petitioner, the defendant had no prior criminal history and the imposition of the upper term was based on the victim's vulnerability and violent nature of the crime. Cunningham, 127 S.Ct. at 860-861.

[8] To the extent Petitioner's claim can be construed as applicable to the imposition of consecutive sentences, it too is without merit. In addition to the non-retroactive application, neither Apprendi, Blakely, nor Cunningham, dealt with concurrent sentencing under California law. Although it may be argued that California's consecutive sentencing scheme is undermined by Apprendi and its progeny, this Court declines to extend the holding in Cunningham to the concurrent sentences imposed by the trial court, as it is barred by Teague.

[9] All further citations regarding this claim are to the Reporter's Transcript of case number F044310.

with Petitioner about his defense. Mr. Evers stated that he met with Petitioner on October 17, 2001, along with an interpreter, who gave him copies. (RT 9.) Although counsel could not recall the specifics of the conservation, he knew they talked about the case as he had already reviewed it. (RT 9.) He believed that he informed Petitioner that a motion to continue the trial had been filed so they could prepare the case. (RT 9.) Mr. Evers also Petitioner on December 6, 2001, again with an interpreter present, they discussed the case. (RT 9.)

The second complaint was that Mr. Evers did not talk to him. Specifically, Petitioner stated "When we went to the motion at the preliminary, I told Mr. Evers to talk to me and tell me what had happened there, and he didn't go out." (RT 10.) Petitioner claimed that the Judge instructed Mr. Evers to speak with him about a motion he had filed. (RT 10.) Mr. Evers responded that he "wasn't involved in the preliminary hearing, if that is what he is talking about. I didn't get appointed on this case until October 2nd, and with regard to the motion, the only motion that we had - - pretrial motion was a motion to unseal the search warrant affidavit, and the hearing on that motion was on November the 29th, and the Judge had an in-camera hearing and came out into the courtroom and told me - - or told us that the motion to unseal the search warrant affidavit was denied." (RT 11.)

The third complaint was that Mr. Evers failed or refused to subpoena witnesses and gather evidence in support of his defense. (RT 11.) Petitioner claimed he requested that a co-worker named Jose and the landlord of the house he was renting at time of his arrest be called to testify at trial. (RT 12.) Mr. Evers declared that he had in fact subpoenaed Petitioner's former co-worker Jose Herrera; however, despite counsel's insistence for Mr. Herrera to be present at trial, he did not show up. (RT 13.) He did not seek a continuance because his investigator, Gonzalo Ramirez, was attempting to locate him. (RT 13.)

The next complaint was that Mr. Evers failed to conduct a proper investigation in support of his defense. (RT 13.) Specifically, Petitioner stated "He didn't investigate that I didn't sell drugs, that I had my job, that - - the issue of the fingerprints on the gun. All it was was that they found that there [sic] and it was mine. There were no prints or anything. [¶] Also, with the issue with the laboratory investigation, that they were opening up the bags and they were shaking them

14

up, moving things around. Mr. Evers didn't say anything about that. They were moving around the evidence, shaking it up, and Mr. Evers said nothing about that. All of that is written in the paperwork. All of that happened in court. Mr. Evers never said anything about why they were mixing those all in. (RT 14.) Mr. Evers responded that he was not exactly sure what Petitioner was talking about, but he believed Petitioner was referencing something that happened during trial. (RT 14.) Petitioner had stated that he believed the police had mixed the drugs with horse feed. (RT 15.) Mr. Evers did not have the drugs tested to determine whether horse feed was present, stating "I believe it was like MSM is a cut that's commonly used in drug trafficking. So I did not pursue it any more than that." (RT 15.)

The next issue was that Mr. Evers did not present any expert witnesses with regard to the quantity of methamphetamine. (RT 16.) Mr. Evers stated that "the elements of possession, as far as a usable amount, it doesn't have to have a narcotic effect or anything like that. It has to be a usable amount within it, and the laboratory analyst, I believe, testified there was a usable amount, so - - but I didn't have it independently analyzed to determine, I suppose, the quality of the substance, which is - - as I understand the law, is not necessary for the prosecution to prove. It just has to be evidence that is a usable amount. (RT 17.)

The next complaint was regarding filing a motion in which Petitioner stated "In '91, Mr. James Sorena got me the dismissals. First they were won in the Appellate Court, then they were reversed, and Mr. Sorena got them dismissed. And then in '96, nonetheless, they were used. And I didn't realize that until later on. I never received the paperwork. That information should not have been on my record. They had been dismissed, and they are being used - - this is the second time." (RT 17.) Mr. Evers responded that he did not know what Petitioner was "referring to from 1991 or 1996 since [he] didn't represent him, and [he didn't] have anything in [his] files to indicate anything about some case being dismissed in 1991." (RT 17-18.) The judge ruled that since this involved a sentencing issue, it was "out of order in terms of our discussions here today. That issue is not before us." (RT 18.)

Petitioner next claimed that Mr. Evers failed to impeach prosecution witnesses. After the trial court advised Petitioner that this inquiry dealt with counsel's alleged failure to impeach the

prosecution's witnesses, Petitioner stated, "There is definitely one.  When one of the young girls was testifying there, I don't know the name, I told my lawyer myself why is she testifying if she doesn't even know me?  They asked if she had any dealings with me, and the girl answered yes.  It was right then that they stopped court.  They took a break to eat, and then the witness - - they didn't bring her back after that.  I think her name was Rosa Leah or - - I'm not sure.  He should have said something.  She was testifying against me with these charges.  The court right then stopped." (RT 19.)  Mr. Evers stated that he requested the juvenile records of O. Martinez and R. Martinez prior to trial.  (RT 20.)  O. Martinez had suffered a prior misdemeanor hit and run, and when he impeached her with the incident, she stated that the car belonged to her sister which prompted no further inquiry.  (RT 20.)

Petitioner was next asked to articulate what evidence Mr. Evers failed to present in support of any motions filed on his behalf.  (RT 20-21.)  Petitioner got off the subject complaining that one of the officers was referring to a different address where he did not reside and one of the juvenile females was found in a motel with drugs.  (RT 21.)  When the court clarified that the inquiry was limited to Mr. Evers' failure to present evidence in connection with any motions filed on Petitioner's behalf, Petitioner stated he had no further information.  (RT 21.)

Petitioner was next asked to elaborate on his claim that Mr Evers had "failed or refused to declare his own prejudice or conflict against you and has taken on the role of a surrogate prosecutor."  (RT 21-22.)  Petitioner stated, "he didn't present evidence and he gave me extra time.  They sentenced me and didn't take into consideration the count.  There is a mistake.  He also didn't bring in the witnesses.  He let the prosecution testify against me when they had mixed in the drug.  If there's only four to five grams, how are they going to come up with a hundred?  And Mr. Evers knew that.  The information was right there.  They testified as to how they mixed it, and he did nothing.  (RT 22.)  Mr. Evers stated that a conflict of interest was discussed.  (RT 22.)  With regard to the mixing of the drugs, counsel stated that the only way for Petitioner to get in such evidence was for him to testify which he did not want to do.  (RT 22.)

The last item was Petitioner's claim that Mr. Evers had failed to challenge the search

1   warrant. However, the trial court noted that Evers had, in fact, presented a motion to contest the
2   warrant. (RT 23.) Petitioner said he had nothing else to say in regard to that allegation; he
3   claimed "they never gave me a search warrant." (RT 23.)
4       The trial court asked Petitioner is he had anything else to say in support of his motion for
5   substitute counsel. (RT 23.) Petitioner responded, "The main thing that – ever since the first
6   time when he said he's put in the motion, I hadn't met him yet, but he put in the motion, and I
7   wanted him changed, and they never changed him." (RT 23.) The trial court then denied
8   Petitioner's motion for substitute counsel, making the following finding:

> The Court, of course, is considering this as information that was meaningful to the case and useful to your defense at the time of the trial to determine whether a motion to be heard at that time, based on this same information, would have been granted, and the Court finds that each of the grounds you have raised do not establish a basis for removing Mr. Evers as your counsel of record at that time.
>
> The Court does not find that he has either failed to reveal any prejudice that he has against you or that he has failed to either explore or gather information which would have been suitable to your defense. To the degree information at his disposal was not offered in evidence, it was based on either your decision not to testify or tactical decisions that that information would have been harmful to your defense.
>
> I don't find any failure to confer or communicate with you in preparation or to attempt to gather evidence appropriate to the matter. So I will deny the request, the motion to relieve Mr. Evers as counsel of record. Had this matter been heard at that time, based on this same information, I believe it would have been appropriate for the Court to deny the motion at that time and proceed to trial.

(RT 24-25.)

    2.    Analysis of Claim

    "[T]o compel one charged with grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever." Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir. 1970). The trial court must conduct an "appropriate inquiry into the grounds for such a motion" on the record before proceeding further. See Schell v. Witek, 218 F.3d 1017, 1026 (9th Cir. 2000). In a habeas corpus petition, the Court must determine whether the trial court's denial of a petitioner's Marsden motion "actually violated [the petitioner's] constitutional rights in that the conflict between [the petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client

relationship that fell short of that required by the Sixth Amendment." Id.

As previously stated, pursuant to the Court of Appeal's remand, on September 29, 2003, the trial court conducted a hearing on Petitioner's complaints relating to his appointed trial counsel. At the conclusion of the hearing, the trial court denied Petitioner's motion for substitute counsel. (RT [F044310] at 24-25.)

In rejecting Petitioner's claim on direct appeal, the state appellate court held:

> Contrary to [Petitioner's] contentions that the trial court refused to listen and consider several of his complaints regarding his appointed counsel's representation, the record reflects the trial court was attentive and conscientious in addressing each of [Petitioner's] concerns. The trial court properly limited the hearing to issues that had arisen at the time he made his October 19, 2001, motion and to those proceedings involving the same defense counsel representing him at that time. When [Petitioner] complained of his representation at a prior hearing, the trial court acknowledged that his counsel had only been recently appointed and was not present at the preliminary hearing. Indeed, [Petitioner's] counsel (the second one appointed following [Petitioner's] previous complaints) was appointed only weeks earlier on October 2, 2001.
> As examples of the "ineptness" and lack of involvement in his defense, [Petitioner] claims his counsel did not move to dismiss count 4 and failed to object to the calculation of his sentence - - both issues this court subsequently reversed. It should be noted, however, that at the time of [Petitioner's] original sentencing on January 29, 2002, his counsel moved to stay count 4 and to lower the aggregate sentence. Regardless, however, we will not find that errors uncovered on appeal constitute sufficient grounds to demonstrate [Petitioner] received inadequate representation warranting a new trial or reversal under *Marsden*.
> In short, the record of the *Marsden* proceedings on remand disclose the trial court appropriately entertained [Petitioner's] complaints about his representation and found those complaints did not warrant a substitution of counsel.

(Exhibit A, at pp. 4-5, attached to Answer.)

On remand, the trial court carefully considered Petitioner's motion for substitute counsel as of the time he made the last request *before* trial. The trial court went through each and every complaint raised by Petitioner and granted him and counsel the opportunity to respond. Although Petitioner may have had disagreements with counsel over trial tactics and may have been unsatisfied with his preparation and representation, Petitioner simply does not show that his Sixth Amendment right to counsel was violated by the trial court's denial of his Marsden motion. See Morris v. Slappy, 461 U.S. 1, 13-14 (1983) (holding that Sixth Amendment requires only competent representation and does not guarantee a meaningful relationship between a defendant

and counsel). Furthermore, the mere fact that appellate counsel obtained a reversal and dismissal of Count Four, does not demonstrate that trial counsel was ineffective.[10] The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and
2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **October 11, 2007**                              **/s/ Dennis L. Beck**
                                                                              UNITED STATES MAGISTRATE JUDGE

---

[10] Indeed, as noted by the state appellate court, trial counsel argued that the sentence on Count Four should be stayed, lowering his aggregate sentence. (CT 391-392.)